**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JOHN HENRY KNIGHT**, | |
| Plaintiff, | |
| v. | Case No. 1:13-cv-00880 (CRC) |
| **RAY MABUS, Secretary of the Navy**, | |
| Defendant. | |

## MEMORANDUM OPINION

John Henry Knight resigned his job at the Office of Naval Intelligence after it was recommended that he be fired for verbally threatening three of his co-workers.  He has now sued the Navy for workplace harassment and discriminatory termination.  Finding that Knight has failed to present sufficient evidence to support either claim, the Court will grant summary judgment in favor of the Defendant.

### I.      Background

Plaintiff John Henry Knight, proceeding *pro se*, once held the position of Property Disposal Specialist at the Office of Naval Intelligence ("ONI"), Mission Support Directorate ("MSD"), Installation Operations Department.  The position required that he "be eligible for assignment to sensitive duties," Def.'s Mem. Supp. Mot. Dismiss Alt. Summ. J. ("Def.'s Mem."), Ex. 1, at 2, and have a top secret clearance.  Knight reported to Lori Gorczyca, who was his team lead; Douglas Richard Lacey, who was his first-level supervisor; Mark Lawson, who was his second-level supervisor; and Timothy Gavaghan, who was his third-level supervisor.

At some point, Knight's supervisors developed concerns about his work attendance.  On several occasions, he arrived late, took long lunches, or left early, and at other times his

whereabouts during the workday were unknown.  At Mr. Lacey's request, the ONI Inspector

General ("ONI/IG") investigated suspicions of time and attendance abuse by Knight from

January 6, 2008 through August 21, 2009, covering 42.5 pay periods, or 3,400 hours.  Among

other sources, the investigator reviewed employee entry- and exit-card data as well as time

sheets.  When asked to address these absences, Knight claimed that he was participating in an

exercise program, had trouble finding parking, was on administrative leave, and was visiting a

branch of the Federal Credit Union.  Although Knight accounted for and received credit for

certain time periods, there remained "discrepancies totaling 275 hours, 15 minutes during the

period in question," substantiating his supervisors' suspicions that Knight had failed to properly

account for his absences in violation of Department of Defense rules.  Def.'s Mem., Ex. 8 ¶ 3.

Based on the results of the ONI/IG investigation, Mr. Gavaghan proposed Knight's

termination.  Knight appealed the proposal, but the MSD's Deputy Director issued a decision to

remove Knight from federal service in May 2010.  Before the removal took effect, however, the

parties voluntarily entered into a Last Chance Agreement ("LCA") in June 2010, which

suspended Knight's removal for a probationary period of two years.  Among other conditions,

Knight agreed to a 25-day suspension without pay, "[t]o maintain satisfactory punctuality,

attendance, and good work habits acceptable to management," and to avoid misconduct.  Id. Ex.

13 ¶ 3.  And if, at the end of the two-year period, Knight had fulfilled the agreement's

requirements and kept his security clearance, the removal would be canceled.

Knight squandered his "last chance" after only a few months.  In January 2011, Mr.

Gavaghan again proposed Knight's removal, citing him for making threats and exhibiting other

disrespectful behavior toward co-workers and supervisors.  Id. Ex. 14, at 1.  In a Notice of

Proposed Removal addressed to Knight, Mr. Gavaghan described three incidents to support the

proposal:

> I held a meeting with [Mr. Lawton, Mr. Lacey, Ms. Gorczyca] and you on 22 September 2010.  The purpose of this meeting was to address personnel, time and attendance, and communications issues that were having a negative effect of the operations of the Property Management Team.  When I solicited solutions to resolve the strained work environment and the perception of a hostile environment, you made the following statement: "[F]ire her and shoot him[,"] indicating Ms. Gorczyca and Mr. Lacey.  Your comment would have been perceived as a threat and disrespectful to the reasonable person and was perceived as disrespectful and a threat by your supervisors.  Your comment has created pervasive mistrust, unease, and fear in the workplace, which negatively impacts the Property Management Team and its members professionally and personally and reduces the team's ability to effectively and efficiently fulfill the mission of the Agency.

> . . . . On 19 August 2010, Mr. Joseph Collins, Property Management Team Member, was talking with Mr. Shearer in Mr. Shearer's office.  You stopped Mr. Collins upon leaving Mr. Shearer's office and inquired about his discussion with Mr. Shearer.  When Mr. Collins refrained from engaging with you regarding your discussion, you stated the following: "You know snitches live in ditches[.]"  Your comment would have been perceived by the reasonable person as a threat and disrespectful and was perceived by Mr. Collins as a threat and disrespectful.

> . . . . On 30 June 2010, Mr. Lacey spoke with you concerning your absence from a mandatory Directorate all-hands meeting and your absence from a standing bi-weekly property management meeting.  Subsequently, on 20 July 2010, Mr. Lacey issued you a Memorandum for the Record (MFR) that addressed this concern and steps needed to manage your calendar to ensure that you did not miss any future scheduled meetings.  You indicated to Mr. Lacey that you were not like him and that you don't do that.  When Mr. Lacey advised you of your need to be more responsible, you refused to sign the MFR and stated the following, "Looks like you're starting this stuff again."  Your comments to Mr. Lacey would have been perceived by the reasonable person as disrespectful and [were] perceived by Mr. Lacey as disrespectful.

Id. Ex. 14 at 1-2; see also id. Ex. 15.  Based on these events, Mr. Gavaghan concluded that

Knight had "caused a disruption in the workplace and foster[ed] relationships that are adversarial

and hostile[.]"  Id. Ex. 14 at 2.  In addition, he found that Knight's behavior "caused ONI

management . . . to spend many hours of work effort to address [Knight's] actions, when such

time could have been used more productively." Id.  Mr. Gavaghan thus recommended Knight's

removal.

A responsible official within the Navy reviewed a written response to the removal

proposal submitted by Knight, but decided to "effect [his] removal from Federal Service" in

February 2011, based on the incidents described in the removal proposal, which she concluded

amounted to a breach of the LCA's provision against misconduct. Id. Ex. 18.  Before the

decision took effect, Knight submitted his resignation.

Knight then contacted ONI's Equal Employment Opportunity and Diversity Office in

March 2011.  The parties engaged in an alternative dispute resolution proceeding the next month,

but were unable to resolve the matter.  In May 2011, Knight submitted a formal complaint to the

Agency, alleging discrimination based on race through "unfair hiring, firing, promotion, awards,

performance appraisal and disciplinary procedures." Id. Ex. 21.  He cited four incidents in

support of his claim:

> (1) Ms. Lori Gorczyca continued to monitor his time and attendance (when he went
>     on break, went to lunch, left the office and when he returned to his desk).
> (2) On one occasion, Ms. Gorczyca yelled at [plaintiff] about bar coding some
>     equipment.
> (3) In July 2010, Mr. Rick Lacey accused him of being tardy and missing scheduled
>     meetings.
> (4) Accused of threatening Mr. Louis Collins on or about August 19, 2010, when
>     [plaintiff] and Mr. Collins were joking in the office and [plaintiff] said, "You
>     know snitches get stiches."

Id. Ex. 23 ¶ 4.  ONI accepted his complaint of discrimination for investigation, and characterized

the claim in the following terms:

> Based on review of [Knight's formal charge of discrimination and the EEOC
> Counselor Report], [Knight] alleged he was subjected to harassment by ONI
> management based on race (African American).  The harassment began September
> 2007, to September 2009.  The claim[] before the agency is as follow[s]:

> Was [plaintiff] discriminated against and subject to acts of harassment by Mr. Rick Lacey, his immediate Supervisor, Ms. Lori Gorczyka, his team leader, and subjected to on-going harassment that began on or about June 11, 2010, until February 18, 2011, when he was ultimately terminated from the roles[?]

Id. Ex. 23 ¶ 3.  At that point, Knight had an opportunity to notify ONI of any error in the claim it accepted for investigation, id., Ex. 23 ¶ 5, and to "amend [his] complaint at any time prior to the conclusion of the investigation to include issues or claims like or related to those raised in [his] complaint," id., Ex. 23 ¶ 8.  Knight neither identified an error in the accepted claim nor amended his complaint.

An Administrative Judge granted summary judgment in the Agency's favor based on the record of investigation and the parties' submissions:

> [T]he Agency is . . . entitled to a judgment as a matter of law because the Agency's treatment of [Knight] was based on legitimate, non-discriminatory and non-pretextual reasons in that [he] failed: (1) to maintain satisfactory punctuality, attendance, and good work habits acceptable to management, and (2) he committed misconduct in the form of threats directed at co-workers.

Id. Ex. 24, at 3.  The Agency issued its Final Order in February 2013.

Knight filed this suit four months later.  He brings this action under Title VII of the Civil Rights Act of 1964, as amended ("Title VII").  See 42 U.S.C. § 2000e et seq.; see also id. § 2000e-2(a) (declaring it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race").  In his Complaint, he alleges that he "was racially discriminated against, harassed, falsely accused of misconduct [and] poor performance and wrongfully terminated."  Compl. ¶ 1.  He further alleges that the Agency engaged in racially motivated, "[u]nfair hiring, firing and awarding practices," evidenced by the absence of outstanding performance recognition for non-whites, the lack of non-white new hires in the division, and the removal of black employees from the division.  Id.  Knight demands damages and equitable relief.  Id. at 2–3.

After the parties engaged in discovery, Defendant moved to dismiss the Complaint or alternatively, for summary judgment.  Defendant moves to dismiss on the ground that Knight failed to exhaust his administrative remedies.  And it moves for summary judgment on Knight's hostile work environment claim on the ground that Knight failed to show that the Agency's alleged offensive conduct was sufficiently severe or pervasive, and on his wrongful termination claim on the grounds that the Agency was justified in deciding to remove Knight and that Knight's voluntary resignation does not constitute an adverse employment action by the Agency.

## II.     Standard of Review

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  In other words, it "must 'plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  Patton Boggs LLP v. Chevron Corp., 683 F.3d 397, 403 (D.C. Cir. 2012) (quoting Iqbal, 556 U.S. at 678) (alteration in original).  The factual allegations put forward by a plaintiff proceeding *pro se* are held "to less stringent standards than formal pleadings drafted by lawyers."  Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 n.2 (D.C. Cir. 2000) (quoting Haines v. Kerner, 404 U.S. 519, 520 (1972)) (internal quotation mark omitted).

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Although the burden is on the movant to show that there is no dispute of material fact," the nonmoving party bears the burden of producing "evidence that would support a jury verdict."  Al-Saffy v. Vilsack, 54 F. Supp. 3d 79, 84 (D.D.C. 2014) (quoting Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 256 (1986)).  "In ruling on a motion for summary judgment, the court accepts as true the nonmovant's evidence and draws all reasonable inferences in favor of the nonmoving party." Uzoukwu v. Metro. Wash. COG, No. 11-391, 2015 WL 5541578, at *5 (D.D.C. Sept. 18, 2015) (citing Anderson, 477 U.S. at 255).  However, the nonmovant may not "rely on mere allegations or conclusory statements."  Id. (citing Veitch v. England, 471 F.3d 124, 134 (D.C. Cir. 2006) (Rogers, J., concurring)).

### III.    Analysis

#### A.    Exhaustion of Administrative Remedies

Defendant moves to dismiss Knight's race discrimination claims on the ground that he failed to exhaust his administrative remedies.  See Def.'s Mem. 11-13, 15.  A plaintiff's failure to exhaust administrative remedies is a basis for dismissal of a claim under Rule 12(b)(6).  See, e.g., Hicklin v. McDonald, No. 14-cv-01569, 2015 WL 3544449, at *2 (D.D.C. June 8, 2015).

In order to exhaust administrative remedies before bringing an employment discrimination action in federal district court under Title VII as required, see Hamilton v. Geithner, 666 F.3d 1344, 1349 (D.C. Cir. 2012), the employee must contact an EEO Counselor to initiate informal counseling "within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action," 29 C.F.R. § 1614.105(a)(1); see also Woodruff v. Peters, 482 F.3d 521, 527 (D.C. Cir. 2007).  If the matter is not resolved informally, the employee may file a formal complaint with the agency.  See 29 C.F.R. §§ 1614.105(d), 1614.106(a).  The administrative charge of discrimination not only notifies the employer of a claim but may also narrow the issues for resolution by a court.  See Park v. Howard Univ., 71 F.3d 904, 907 (D.C. Cir. 1995) (citing Laffey v. Northwest Airlines, Inc., 567 F.2d 429, 472 n.325 (D.C. Cir. 1976)).

The scope of any subsequent lawsuit "is limited . . . to claims that are 'like or reasonably related to the allegations of the charge and growing out of such allegations.'" Park, 71 F.3d at 907 (citing Cheek v. W. and S. Life Ins. Co., 31 F.3d 497, 500 (7th Cir. 1994)); see also Payne v. Salazar, 619 F.3d 56, 65 (D.C. Cir. 2010) (reinforcing Park's holding insofar as claims in civil suit must arise from the administrative investigation that can reasonably be expected to follow the charge of discrimination). In other words, "[a] plaintiff fails to exhaust [his] administrative remedies when the complaint [he] files in federal court includes a claim that was not raised in the administrative complaint." Mogenhan v. Shinseki, 630 F. Supp. 2d 56, 60 (D.D.C. 2009).

Defendant refers to the charge of discrimination accepted by the ONI for investigation, see Def.'s Mem., Ex. 23, and points to several discrepancies between the factual allegations in the Complaint filed with this Court and those in the administrative charge: first, that the Complaint, unlike the administrative charge, alleges race discrimination in the form of unfair hiring, firing, and awarding practices—as well as specific alleged instances, such as greater scrutiny of Knight than of his white colleagues, denial of a requested transfer, and assignment as a backup or alternate to white colleagues; second, that while the Complaint alleges discrimination dating from 2004, the administrative charge claims harassment beginning only in September 2007; third, that the Complaint raises allegations pertaining to the employee card reader system, which did not appear in the administrative charge; and fourth, that unlike the Complaint, the administrative charge made no reference to the initial proposal of removal or to the LCA. Defendant also underscores that Knight failed to correct any errors in or amend the administrative charge accepted for investigation.

Knight responds by noting that he had "requested relief from the Department [H]ead of MSD-1," the Deputy Directorate Head and the Commander of the ONI and that he sought

guidance from an EEOC official in identifying the issues underlying his claims.  Pl.'s Opp'n at

5.[1]  He also describes several incidents of alleged discrimination—that "non-whites were

systematically released for one reason or another," and that Defendant "consistently used

discriminatory tactics in dealing with non-whites."  Id. at 7.  None of these assertions directly

addresses Defendant's arguments regarding the scope of the administrative charge versus the

scope of the Complaint.  Nevertheless, the Court concludes that Knight prevails on this issue.

Defendant's reading of the administrative charge is too restrictive, particularly where, as

here, Plaintiff is not represented by counsel.  See President v. Vance, 627 F.2d 353, 362-63 (D.C.

Cir. 1980) ("It cannot reasonably be expected that a lay complainant will always phrase his

prayer for relief so narrowly as to leave no question about what he seeks; indeed, he may not

even be aware of all of his legal rights or available remedies.").  Plaintiff's formal complaint of

discrimination alleged race-based discrimination and specifically mentioned unfair hiring, firing,

awards practices, and disciplinary procedures.  The administrative charge as articulated by ONI,

too, claimed race-based discrimination occurring during the time period when the LCA was in

effect, and ending with Knight's termination.  Furthermore, the incidents Knight listed to support

his administrative charge included the monitoring of his time and attendance as well as

accusations that he had threatened his colleague, Mr. Collins.  In short, although the

administrative charge appears to allege only harassment based on race, a subsequent

investigation would reasonably have been expected to concern discrimination based on race as

---

[1] Knight responded to Defendant's motion by submitting four documents appearing on CM/ECF
as a single docket entry [ECF No. 23]: "In Response to the Defendant's statement of undisputed
material facts"; "RESPONSE TO Defendant's motion to dismiss or in the ALTERNATIVE FOR
SUMMARY JUDGMENT"; "ARGUMENT"; and "List of Witnesses."  Knight's submissions
do not contain page numbers.  The Court construes the documents together as Knight's
opposition to Defendant's motion ("Pl.'s Opp'n") and adopts the sequential page numbers
designated by CM/ECF.

well as wrongful termination.  And "EEO complaints are to be liberally construed 'since very commonly they are framed by persons unschooled in technical pleading.'"  Brown v. Marsh, 777 F.2d 8, 13 (D.C. Cir. 1985) (quoting Shehadeh v. Chesapeake & Potomac Tel. Co., 595 F.2d 711, 727 (D.C. Cir. 1978)).  Accordingly, the Court will therefore deny Defendant's motion to dismiss on the ground that Knight failed to exhaust administrative remedies before filing this lawsuit.

**B.      Hostile Work Environment**

Assuming that Knight's allegation that he "was [h]arassed," Compl. ¶ 1, constitutes an attempt to raise a hostile work environment claim, Defendant moves for summary judgment on the ground that Knight can demonstrate no facts to support such a claim, see Def.'s Mem. 18-21. To prevail on a hostile work environment claim, a plaintiff "must show that his employer subjected him to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment.'"  Baloch v. Kempthorne, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (quoting Harris v. Forklift Sys., 510 U.S. 17, 21 (1993)).  In reviewing such claims, courts consider "the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." Id. (citing Faragher v. City of Boca Raton, 524 U.S. 775, 787–88 (1998)).  An actionable hostile work environment claim requires that the work environment be "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."  Faragher, 524 U.S. at 787 (citation omitted).

Knight's Complaint alleges harassment on the grounds that he was reprimanded for absences even though, he maintains, his duties required his presence "at [his] customers['] work

spaces"; that he was denied a transfer because a supervisor "constant[ly] fabricat[ed] bad

conduct and poor performance" reviews; and that he was assigned to serve "as backup or

alternate to [his] white counterparts [where] there was no support system" and where he "was in

need of assistance." Compl. ¶ 1. The administrative charge accepted by ONI for investigation

mentioned one occasion where Ms. Gorczyca allegedly "yelled" at Knight. Def.'s Mem., Ex. 23

¶ 4. And Knight's submissions here refer to being "written up" by Mr. Lacey for arriving late to

work and for unsubstantiated poor-performance claims. Pl.'s Opp'n at 6.

    "Conduct that is not severe or pervasive enough to create an objectively hostile or

abusive work environment—an environment that a reasonable person would find hostile or

abusive—is beyond Title VII's purview." Harris, 510 U.S. at 21. And the "ordinary work-

related activities of a supervisor," such as reprimanding an employee for tardiness, "are not

sufficiently severe or abusive to constitute objective harassment." Uzoukwu, 2015 WL 5541578,

at *8. In addition, one occasion of yelling is insufficiently pervasive or severe to support a

hostile work environment claim. Id. (describing an incident of yelling as "the kind of 'ordinary

tribulation[] of the workplace' that does not give rise to a hostile workplace claim (quoting

Franklin v. Potter, 600 F. Supp. 2d 38, 76 (D.D.C. 2009))); see also Baloch, 550 F.3d at 1201

(affirming rejection of hostile work environment claim where defendant yelled, used

profanity, threatened arrest, and described plaintiff's work as "bullshit"). Because Knight has

not alleged sufficiently severe or pervasive treatment to support his hostile work environment

claim, the Court will grant summary judgment to the Defendant on this claim.

### C.     Discriminatory Wrongful Termination

    Defendant counters Knight's claim of wrongful termination by noting that first, "it is

undisputed that [Knight] resigned," Def.'s Mem. 15, and second, that even though the Agency

gave Knight several opportunities to improve his behavior, Knight "continued to commit acts of

misconduct including making threatening statements to his first-level supervisor . . . and his team

leader," and thus that the Agency was justified in proposing his removal from service, id. at 17.

To make out a claim of employment discrimination, a plaintiff must demonstrate that (1)

he "suffered an adverse employment action" (2) "because of [his] race, color, religion, sex, or

national origin." Brady v. Office of Sergeant at Arms, 520 F.3d 490, 493 (D.C. Cir. 2008).

Adverse employment actions include "significant change[s] in employment status, such as

hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a

decision causing significant change in benefits." Taylor v. Small, 350 F.3d 1286, 1293 (D.C.

Cir. 2003) (citing Burlington Indus. v. Ellerth, 524 U.S. 742, 760 (1998)).  Although Knight

alleges discriminatory hiring and awards practices, he does not contend that he ever applied for

but was denied a promotion, that he was entitled to but was denied an award, or that he requested

but was denied a transfer.  Nor can he demonstrate that the Notices of Proposed Removal amount

to adverse employment actions because "[n]o 'tangible harm' or 'materially adverse

consequence' followed directly from [them], and hence [they are] not separately actionable."

Boykin v. England, No. 02-0950, 2003 WL 21788953, at *5 (D.D.C. July 16, 2003) (quoting

Brown v. Brody, 199 F.3d 446, 457 (D.C. Cir. 1999)).  Lastly, Knight has not demonstrated that

the Agency fired him, whether due to his race or otherwise.  Indeed, Knight himself

acknowledges that he opted for resignation in order to "protect [his] chances to get another

federal position."  Pl.'s Opp'n 5.  Because a resignation is "presumed to be voluntary," Aliotta v.

Bair, 614 F.3d 556, 566 (D.C. Cir. 2010) (quoting Veitch, 471 F.3d at 134) (internal quotation

mark omitted), Knight's resignation does not amount to an adverse employment action by his employer.[2]

Even if the Court were to find that Knight had suffered an adverse employment action, Defendant asserts a legitimate, non-discriminatory reason for its decision to terminate Knight. And the D.C. Circuit has instructed that, at the summary judgment stage of a "Title VII disparate-treatment suit where an employee has suffered an adverse employment action and the employer has asserted a legitimate, non-discriminatory reason for the decision," the district court need only resolve "one central question"—whether the employee has "produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin." Brady v. Office of Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008). The plaintiff at all times bears the burden of persuasion to show that the defendant's proffered reason was not the true reason for the employment decision. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981).

Defendant points to ample support in the record for its legitimate non-discriminatory reason to remove Knight from federal service—that Knight breached the LCA, which had merely held his removal in abeyance for a two-year probationary period during which he was to commit no further misconduct. And Knight does not cite any support in the record for the proposition that Defendant's reasons for proposing his removal were pretextual or unworthy of credence. The Court therefore will grant summary judgment for Defendant on this claim.

---

[2] Plaintiff does not raise a constructive discharge claim. But even if he had raised such a claim, it would fail. "An employee's resignation or retirement, when the only other available option for the employee is removal by the employer *for valid reasons*, does not qualify as constructive discharge." Hill v. Gray, 28 F. Supp. 3d 47, 61 (D.D.C. 2014).

**IV.     Conclusion**

For the reasons stated above, the Court will deny Defendant's motion to dismiss and grant Defendant's motion for summary judgment.  An Order accompanies this Memorandum Opinion.

<br>

CHRISTOPHER R. COOPER
United States District Judge

Date:     September 30, 2015